| 40 281 |
| 43 284 |

JOHN GETTY *et al.* v. THE C. R. BARNES MILLING COMPANY.

1. MILLING COMPANY — *Purchase of Flour, When Binding — Corporate Powers.* Before the president and manager of a milling company, incorporated for the purposes of conversion and sale of agricultural products, can bind the company by the purchase of flour, it must be shown that such purchase came within the purview and scope of its corporate powers, or was authorized by the company, or that some fact or circumstances existed that rendered the purchase necessary for the protection and interest of the milling business, or that some benefit resulted to the company from the purchase.

2. FACTS, *not Creating Liability against Company.* Where the president and general manager of a company incorporated for the purposes of "conversion and disposal of agricultural products by means of mills, elevators, stores, or otherwise," purchases flour, and such purchase is unknown to and unauthorized by the company, and no benefit results to it by reason of such purchase, *held,* in an action by the seller against the company that such facts alone will not create a liability against the company.

3. OPTIONS IN GRAIN — *Purchase of Flour and Wheat, not Ratified.* Where the president of a milling company incorporated for the purpose of converting and selling agricultural products, purchases flour in the name of the company, and ships the same to a dealer in options in grain, and pledges the flour in payment of options on wheat, and such purchase of flour and wheat is unknown to and unauthorized by the milling company, and no benefit results to it by reason thereof, *held,* that such unauthorized acts will not amount to a ratification of such purchase.

### *Error from Clay District Court.*

ACTION brought by John Getty and Arthur Lakin, partners as *John Getty & Co.,* against the *C. R. Barnes Milling Company,* a corporation, to recover the purchase-price of two car-loads of flour. At the May term, 1886, the court sustained a demurrer to plaintiffs' evidence; new trial denied; judgment against plaintiffs for costs. They bring the case here. The material facts appear in the opinion.

*M. M. Miller, E. F. Robinson,* and *C. C. Coleman,* for plaintiffs in error.

*J. S. Walker,* and *C. M. Anthony,* for defendant in error.

Opinion by CLOGSTON, C.: Plaintiffs in error brought this action to recover $1,350, the price of flour sold by them to C. R. Barnes, or the C. R. Barnes Milling Company; and at the trial a demurrer was sustained to the plaintiffs' evidence. John Getty & Co. were a milling firm at Ellsworth, Kansas, and the defendant, the C. R. Barnes Milling Company, was a corporation engaged in the milling business at Clay Center. About July 27, 1885, C. R. Barnes went to Ellsworth and purchased of the plaintiffs sixty thousand pounds of flour, at $2.25 per hundred-weight, to be paid for in thirty days. At

this time Barnes represented that he was the president of the C. R. Barnes Milling Company, and was its manager, and that the flour was for the purpose of supplying its trade. The flour was shipped to C. R. Barnes at Kansas City, and placed to the credit of the Barnes Milling Company, with one A. J. Meade, who was a commission merchant in Kansas City. Shortly afterward, Barnes, in the name of the milling company, commenced purchasing options on wheat, and continued so to do until some fifty thousand bushels had been purchased. The flour purchased of the plaintiffs, and other flour owned by Barnes, was placed with Meade to pay the margin on the wheat deals. Wheat gradually declined on the market, and his options were closed out at a loss of more than $5,000, more than covering all the flour stored with Meade. All of these transactions—the purchase of the flour stored with Meade, and the purchase of wheat on the market—were without the knowledge of the Barnes Milling Company, save Barnes himself, who was the president of the company; and all of said transactions were repudiated by the company as soon as known by it. Plaintiffs now insist that they had a right to rely upon the statements of Barnes, and that his statements were binding upon the corporation of which he was president; while on the other hand defendant insists that the corporation is not liable for the acts of Barnes unauthorized by the company, and that such a contract was not within the purview and scope of its corporate business. Plaintiffs claim that even if the purchase was unauthorized, yet it was ratified by the subsequent transactions in Kansas City.

The charter under which the defendant company was doing business was as follows: "The purposes for which this corporation is formed are for the conversion and disposal of agricultural products by means of mills, elevators, stores, or otherwise." The first question is, under this charter, had the president or general manager of the company, without special direction from his company, the right to go upon the market and purchase flour? In our judgment this question must be decided by determining whether flour is an agricultural prod-

uct. In one sense it may be said that flour is a product of agriculture, but in the common application of the term we think this is not true. The product of agriculture is that which is the direct result of husbandry and culture of the soil. It embraces the product in its natural, unmanufactured condition. As cotton is a product of agriculture, yet cotton cloth, or other fabrics made from cotton, can hardly be termed agricultural products. If the products resulting from the manufacture of agricultural products are not to be determined by the common acceptation of the phrase "agricultural products," then this charter would embrace an innumerable variety of manufactures and their products. Flour, being the product of manufacture, is not strictly within the purview of this charter. But under some circumstances and conditions a corporation may be authorized to purchase and sell property or goods not strictly embraced in the purposes enumerated in its charter; the general rule being that a corporation may carry on the business for which it was chartered, in the usual and ordinary manner. (*Canal Co. v. Vallette*, 21 How. 424; *Thompson v. Lambert*, 44 Iowa, 239; *McKiernan v. Lenzen*, 56 Cal. 61.) What is or is not within the chartered powers of a corporation cannot be laid down as a strict rule of law. Each particular case must be governed by itself, and the facts that surround it may include or exclude it from its powers. There might be instances in which a corporation formed as the defendant was could purchase flour, and still not be in violation of its chartered rights. For instance, its mill might be disabled, and for the purpose of holding and controlling its trade during the time of repairs, flour might perhaps be properly purchased by its officers or agents for the purpose of carrying on the legitimate objects for which the corporation was organized. (*Fleckner v. Bank of U. S.*, 8 Wheat. 351; *National Bank v. Exchange Bank*, 92 U. S. 128; *Organ Co. v. Reddish*, 57 Iowa, 55.) But because some such peculiar situation would give the corporation the right to go apparently outside of its strict chartered powers, it would not authorize the act complained of in this action unless some such peculiar

reasons existed for so doing. (*Lynderborough Glass Co. v. Mass. Glass Co.*, 111 Mass. 315; *Sherman v. Fitch*, 98 id. 59.)

It has been held that a railroad company may purchase coal land and engage in coal mining if thereby it can supply its wants cheaper than by purchasing on the market. So it may under peculiar circumstances charter or purchase steamships in connection with its business, where it is shown that such acts facilitate and add to the general purpose and scope of the business. So it has been held that railroad companies may build and manage hotels, reading rooms, book stalls, where those things tend to the comfort of its employés or patrons; that it may also build docks, elevators and warehouses for the storage of property transported, and erect workshops for the manufacture and repair of machinery. But these things can only be done where the peculiar circumstances of the case make them applicable. (*Lyde v. Eastern Rly. Co.*, 36 Beav. 16; *Hoagland v. Hannibal Rld. Co.*, 39 Mo. 451; *Pearce v. Madison Rld. Co.*, 21 How. 441.) While a railroad company may purchase and mine coal for its own use, yet it cannot engage in that business for sale and speculation, and it can make no difference that this transaction would be remunerative to the company. (*Att'y Gen. v. Great Northern Rly. Co.*, 1 Dr. & Sm. 154; *Alexander v. Couldwell*, 38 N. Y. 480.) So in the present case, under peculiar circumstances the defendant might have purchased flour to sell again, to meet some temporary want, or to supply and protect its trade, yet it could not engage in this class of business as a business, under its charter; and where the plaintiffs seek to justify a sale to the officer of a corporation, they must either show that it comes within the purview of the charter of that corporation, or else some peculiar facts or circumstances that would make an exception to the general rule. Nothing of that kind is shown in this case.

1. Purchase of flour, not within scope of corporate powers.

2. Liability of company, not shown.

The next question is, did the acts of the president of the corporation, in depositing this flour at Kansas City, and the purchase of wheat on the market, ratify the purchase? The

evidence in this case clearly shows that the purchase of wheat by Barnes in the name of the milling company, which under the charter he had a right to do, was simply an option purchase, and not an actual purchase; in other words, it was a species of gambling contract, and not such a transaction as would ratify an unauthorized act. Such contracts of purchase as that shown by the evidence in this case, have been universally held to be illegal and void. ( *Washer v. Bond,* and cases cited, *ante,* p. 84.)

3. Unauthorized purchase, not ratified.

We are therefore of the opinion that the judgment of the court below should be affirmed.

By the Court: It is so ordered.

VALENTINE and JOHNSTON, JJ., concurring.

HORTON, C. J.: The only question which I think important to consider is, whether there was any evidence introduced upon the trial which fairly tended to make the milling corporation liable for the flour purchased by C. R. Barnes, the president and general manager of the corporation. The corporation was engaged "in the conversion and disposal of agricultural products, by means of mills, elevators, stores, or otherwise." Under the terms of its charter, the corporation had the power to carry on the business of buying grain, (not flour,) and of making flour and meal, and selling and disposing of its grain, flour and meal, through its elevators, stores and otherwise. Therefore, the purchase of flour—a manufactured article—was not the usual and ordinary business of the corporation. It is clear that the flour purchased was not received by, nor did it go to the benefit of the corporation. It was shipped to Kansas City, Missouri, to C. R. Barnes, and not to the milling corporation at Clay Center, where the business of the corporation was carried on. It was also shown that whatever C. R. Barnes may have represented to Mr. Getty, he was, in fact, buying the flour for himself, and not for the corporation; therefore, the contract between Getty and Barnes was unauthorized by the corporation; and, if Barnes used the corporate credit in the transaction for his own per-

sonal interest, the corporation was not bound by the contract, under all the circumstances presented. If the evidence adduced tended to show that Barnes had express authority from the officers and the stockholders of the corporation to purchase flour; or, if he had purchased other flour with the knowledge and sanction of the officers and stockholders of the corporation; or, if he had turned the flour over to the corporation for its benefit; or, if it had been the general custom of the corporation to purchase flour for shipment to Kansas City or other points; then I would say that there was in the case sufficient evidence tending to show original authority for the purchase of the flour, or of a subsequent ratification by the corporation.

As the contract for the purchase of the flour was for the personal benefit of Barnes and no one else, and manifestly to the injury of the corporation at the time of the alleged ratification, clear evidence of ratification would be required before any ratification would be presumed. If the contract had been for the benefit of the corporation, a contrary presumption could be indulged in; and in such a case, very slight evidence of acquiescence would have been sufficient to give validity to the purchase.

For the foregoing reasons, with some hesitation, I concur in the judgment ordered to be entered.