R. T. BATTEY, as Trustee, etc., v. THE EUREKA BANK OF EUREKA, KANSAS, et al.

No. 11,766. (63 Pac. 437.)

1. BANKS AND BANKING—Loans to Stockholders—Lien on Stock. While the officers of a state bank are prohibited from making loans or discounts to a stockholder on the security of stock in the bank, and while the bank cannot thereafter become the purchaser or holder of loans on such stock, unless it shall become necessary to prevent loss on a debt previously contracted in good faith, yet, if a stockholder has become liable to the bank as principal, surety,

.or otherwise, on debts not incurred on such security, it will be entitled to a lien on his stock for such debts as are due and unpaid, and while such liability continues.

2. ———— *Statute Construed.* The clause of the banking statute, "a debt previously contracted in good faith," means loans and discounts honestly made, in the belief that they were safe investments for the bank, and made without fraud, pretense, or any purpose to injure the bank.

Error from Lyon district court; W. A. RANDOLPH, judge. Opinion filed January 5, 1901. Affirmed.

*Lambert & Huggins,* and *Cunningham & Hamer,* for plaintiff in error.

*L. B. Kellogg, C. B. Graves,* and *W. S. Marlin,* for defendants in error.

The opinion of the court was delivered by

JOHNSTON, J.: The principal question presented for decision is whether the Eureka Bank is entitled to a lien on the capital stock of the bank owned by William Martindale for an indebtedness owing by him to the bank. The Eureka Bank is a corporation organized under the laws of the state, with a capital stock of $50,000, divided into 500 shares. William Martindale, who was the owner of 298 of these shares, was a member of its board of directors, and its president. Edwin Tucker was cashier of the bank and in the active management of its affairs.

On July 30, 1898, Martindale applied to Tucker for a loan of $10,000 from the bank, which was given to him on his unsecured individual note. On August 8, 1898, Martindale obtained a second loan from the bank on his individual note for $9848. At the same time Martindale was a stockholder and managing officer of the First National Bank of Emporia, Kan., where he resided, and besides he held large in-

vestments in lands and other property, and was generally regarded a man of wealth. On November 16, 1898, the First National Bank of Emporia failed, and its property and business affairs passed into the hands of a receiver. By an agreement between the creditors and Martindale, his property was turned over to a trustee to be appointed by the judge of the federal court; but in the agreement it was stipulated that collateral securities or liens on the bank stock or other property held by any creditor on November 16, 1898, were not to be disturbed, waived or in any way affected by the agreement. In pursuance of the agreement, R. T. Battey was appointed trustee, and to him Martindale and his wife joined in a deed of trust, which, among other things, conveyed 298 shares of Eureka Bank stock, "subject to lien of Eureka Bank thereon for a stockholder's indebtedness to the bank." The trustee obtained possession of the certificates of stock for the 298 shares in the Eureka Bank, and demanded of the officers of the bank that they transfer the same to him as such trustee, but the bank, claiming a lien on the stock for the indebtedness of Martindale, refused to make the transfer until the indebtedness was paid. The bank brought an action against Martindale on the notes heretofore described, as well as other obligations of smaller amounts, and asked to have his indebtedness enforced as a lien against the bank stock in question. The receiver of the First National Bank of Emporia and R. T. Battey, as trustee, were made defendants, and an order was asked requiring them to surrender to the Eureka Bank the shares of stock in the bank which they had obtained from Martindale. Upon the testimony the bank recovered a judgment against Martindale for the amount of his indebtedness to it, and such indebtedness was held to be a lien

on the bank stock which stood on the books in the name of Martindale.

The trustee challenges so much of the judgment as gives the bank a lien on the Martindale stock. It is to be noted that the agreement under which the trustee was appointed provided that liens on bank stock should not be deemed to be waived or affected by the agreement, and, also, in the deed conveying his property to Battey, Martindale specially excepted liens of the Eureka Bank on the stock in question. Battey took no more than the deed of trust conveyed to him. He was not an assignee in bankruptcy or under the general assignment laws, but was a trustee of an express trust, and his right in the Martindale property was measured by the terms of the instrument by which Martindale conveyed the property to him. He was to take that property, convert it into money, and apply it among the creditors of Martindale as the federal court might direct. By the preliminary agreement and the deed of trust he had notice that liens on the stock were claimed, and also that Martindale recognized the existence of a lien in favor of the Eureka Bank on the stock in question, and of necessity the stock passed into his hands subject to the rights and equities of the bank.

Without settling the question of estoppel asserted against Battey, we pass to the question of the validity of the lien asserted by the bank. This question is determined by the provisions of the banking act. By one section it is provided:

"The shares of stock of an incorporated bank shall be deemed personal property, and shall be transferred on the books of the bank in such manner as the by-laws thereof may direct; but no transfer of stock shall be valid against a bank so long as the registered holder

thereof shall be liable as principal debtor, surety or otherwise to the bank for any debt which shall be due and unpaid, nor in such case shall any dividend, interest or profit be paid on such stock so long as such liabilities continue, but all such dividends, interests or profit shall be retained by the bank and applied to the discharge of such liabilities; and no stock shall be transferred on the books of any bank without the consent of the board of directors, where the registered holder thereof is in debt to the bank for any matured and unpaid obligation; and no transfer of stock shall be made when the bank is in a failing condition, or when its capital is impaired. All transfers of stock shall be certified to the bank commissioner immediately." (Gen. Stat. 1899, § 458; Gen. Stat. 1897, ch. 18, § 21.)

There was a by-law of the bank which expressly provided that the bank should have a first and prior lien on the stock for debts due to the bank by the owners of such stock. The statute already quoted, independent of the by-laws, clearly gives the bank a lien on the stock when the stockholder is liable as principal debtor, surety or otherwise to the bank for any debt due and unpaid. If an indebted stockholder were to transfer his stock free from any lien or claim of the bank, it might result in an impairment of the capital, and so, to protect the capital and customers of the bank, the legislature created a lien and placed a limitation in the statute which prevents the stockholder from transferring his stock even to a *bona fide* purchaser while his liability to the bank continues.

The statute goes further than the giving of a lien to the bank, as it prohibits payment to the stockholder of any dividend, interest or profit on the stock while he is liable to the bank for indebtedness of any kind.

The legislature of Michigan passed a statute containing a provision almost identical with the one under

consideration, and the supreme court of that state held that it created a lien in favor of the bank against which a *bona fide* purchaser of the stock was not protected. (*Michigan Trust Co. v. State Bank*, 111 Mich. 306, 69 N. W. 645; *Citizens' Bank v. Kalamazoo Co. Bank*, 111 id. 313, 69 N. W. 663; *Oakland Co. Savings Bank v. State Bank*, 113 id. 284, 71 N. W. 453.)

If the section quoted stood alone, all would concede the existence of the lien, but the contention is that another section of the act necessarily denies a lien to the bank. It provides:

"No bank shall employ its moneys, directly or indirectly, in trade or commerce, by buying and selling goods, chattels, wares, and merchandise, and shall not invest any of its funds in the stock of any other bank or corporation, nor make any loans or discounts on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith; and stock so purchased or acquired shall, within six months of the time of its purchase, be sold or disposed of at public or private sale. After the expiration of six months any such stock shall not be considered as a part of the assets of any bank: *Provided,* That it may hold and sell all kinds of property which may come into its possession as collateral security for loans or any ordinary collection of debts, in the manner prescribed by law: *Provided further,* That any goods or chattels coming into the possession of any bank as aforesaid shall be disposed of as soon as possible, and shall not be considered as a part of the bank's assets after the expiration of six months from the date of acquiring same." (Gen. Stat. 1899, § 417; Gen. Stat. 1897, ch. 18, § 29.)

This section standing by itself might, perhaps, be interpreted as prohibiting a bank from acquiring a lien upon the stock of its debtors. A somewhat simi-

lar provision in the national-banking act of 1864 was so viewed by the supreme court of the United States. (*Bank v. Lanier*, 11 Wall. 369, 20 L. Ed. 172 ; *Bullard v. Bank*, 18 Wall. 589, 21 L. Ed. 923.) These decisions were made under an act which did not expressly give a lien, as is done in our statute. On the other hand, the national-banking act of 1863, which gave a bank a lien on the stock of its debtors, was modified by the act of 1864, and in place of the lien provided in the former act there was substituted the prohibition against a bank making a loan on the shares of its own capital stock. As was remarked in *Bank v. Lanier*, supra, "congress evidently intended, by leaving out of the law of 1864 the thirty-sixth section of the act of 1863, to relieve the holders of bank shares from the restrictions imposed by that section. The policy on the subject was changed, and the directors of banking associations were in effect notified that thereafter they must deal with their shareholders as they dealt with other people." The striking out of the section giving a lien and the substitution of the prohibitory provision clearly evidenced the intention of congress, and hence by-laws of banks attempting to create liens on stock were held to be in conflict with the act and therefore void. Our statute presents a very different aspect. As has been seen, it expressly gives a lien on the stock of an indebted stockholder, and in another section of the act passed at the same time it declares that a bank cannot "make any loans or discounts on the security of the shares of its own capital stock, . . . unless such security . . . shall be necessary to prevent loss upon a debt previously contracted in good faith."

What, then, was the legislative purpose in regard to creating liens on the capital stock of banks? These

provisions, being included in the same act, should be reconciled, and, if possible, both given force and effect.   In our view, an absolute prohibition of liens on bank stock was not within the legislative intention; and, further, there is room for the operation of both sections.   Considered together, they mean that a bank is prohibited from making a loan or discount in the first instance on the security of its own stock, and that it shall not thereafter become the purchaser or the holder of loans on stock unless it shall become necessary to prevent loss upon a debt previously contracted in good faith.   It would result in this, that while the officers of the bank cannot accept stock as a specific security for a loan or discount when the debt was first contracted, they may afterward accept the stock as security, if the debt has been previously contracted in good faith.   This provision, as will be observed, is mainly an admonition to the officers, and the leading purpose was to prevent a bank from using its money in trade or commerce, buying or selling merchandise, or in the purchase of stock of other banks or corporations, or dealing in its own stock ; and the only penalty provided in the section is that such stock, when secured by it, shall not be considered as a part of the assets of the bank after the expiration of six months.

It will be noted that there is nothing in the statute itself which renders a security taken by the officers of a bank in violation of the provision unenforceable.   And when the section is considered in connection with the other one which absolutely gives the lien, it furnishes strong reasons for the application of the doctrine that a contract made contrary to such a statute is not unenforceable, in the absence of a declaration in the statute itself prohibiting its enforcement.   The national bank-

ing act forbids the loaning of money by national banks upon mortgages on real estate ; but it has been held that where such a loan was made the mortgage was good and enforceable, notwithstanding the violation of this provision ; that the disregard of the prohibitory clause did not vitiate the security taken for the loan, but only laid the bank taking it open to proceedings at the instance of the government. (*National Bank v. Matthews,* 98 U. S. 621, 25 L. Ed. 188 ; *National Bank v. Whitney,* 103 U. S. 99, 26 L. Ed. 443 ; *Logan County Bank v. Townsend,* 139 U. S. 67, 35 L. Ed. 107.)

In *Gold Mining Co. v. National Bank,* 96 U. S. 640, 24 L. Ed. 648, the company was sued by the bank for money which was loaned to it, and they set up as a bar that the loan was made in violation of the banking law, because it exceeded one-tenth of the bank's paid-up capital stock ; but the court held that the violation of the prohibition did not affect the validity of the loan, and that the violation could be questioned only by the government.

In *Thompson v. Saint Nicholas National Bank,* 146 U. S. 240, 13 Sup. Ct. 66, 36 L. Ed. 956, the bank certified a check for a customer who did not have a deposit to meet the check and received therefor bonds as collateral security. This was in violation of the banking law, and the right of the bank to hold its lien on the bonds was contested because of the violation. The court held that the bank could hold the bonds notwithstanding the certification was made in contravention of the act of congress, and in its decision said :

"Moreover it has been held repeatedly by this court that where the provisions of the national banking act prohibit certain acts by banks or their officers without imposing any penalty or forfeiture applicable to particular transactions which have been executed, their

validity can be questioned only by the United States, and not by private parties."

If, however, we should disregard the absence of a prohibition in the statute itself prohibiting the enforcement of a security taken in violation of the act, and should accept the view of the plaintiff in error, we would be unable to grant him the relief which he asks. If the section expressly authorizing a lien is to be regarded as modified by the prohibition, it would result in the view that a bank could never have a lien where a loan was contracted on the specific security of its own capital stock, and could never afterward claim a valid lien on stock except to prevent loss on a debt previously contracted in good faith.

In the first place, it must be held that the loans were not made by the Eureka Bank to Martindale on the security of the stock which he owned. The certificate was not given to Tucker, the cashier, nor was any reference made to the stock at the time the loans were negotiated. It is true that Tucker admitted that he had in mind at the time that Martindale was a stockholder, and that he might not have loaned him so large an amount if it had not been for his connection with the bank. He claimed, however, that the reason that the money was loaned upon his individual note was the fact that Martindale was a large owner of real estate and other banking interests, and was regarded by him to be a man of great wealth. The district court concluded from the testimony that the loan was not made upon the faith of the stock as a specific security, but was based, rather, upon the personal credit of Martindale, and we think the testimony sustains this conclusion.

Was the debt contracted in good faith? A greater amount was loaned to Martindale than is permitted to

be loaned to a single individual under the by-laws and banking rules, and besides no security was taken, which is not in accord with the usages and requirements of banking. The non-observance of these usages, rules and requirements does not necessarily imply dishonesty and bad faith on the part of the cashier. Good faith in this connection means that the loans were honestly made by Tucker, in the belief that they were safe investments for the bank, and that there was an absence of fraud, pretense, or any purpose to wrong the bank. (*Docter and another v. Furch and others*, 91 Wis. 464, 65 N. W. 161; *Winters v. Haines*, 84 Ill. 585, 14 A. & E. Encycl. of L., 2d ed., 1078.) If the loans were fraudulently and collusively made, and the claim that Martindale was financially sound and abundantly able to meet the loans was not in fact believed, but was a mere pretense, there was a lack of good faith which would condemn the transaction. Under the testimony and the finding of the trial court, however, it must be held that the loans were honestly made by the cashier, in the belief that Martindale was not only solvent but that he was financially strong, and that the loans made to him were safe investments; and, further, that they were made without any intent to wrong the bank or any one else, and, therefore, under the rules heretofore stated, were made in good faith.

None of the errors assigned can be sustained, and therefore the judgment of the district court will be affirmed.

Smith, J., concurring.

Doster, C. J. (concurring specially) : I concur in the decision made in this case, and in all of the opinion except that portion which applies the doctrine of the

federal courts that securities which the statute prohibits a bank from taking may neverthless be taken and enforced. However, I have not given sufficient thought to such doctrine to enable me to reject it as unsound, but it does not readily commend itself to me, although repeatedly announced by such high authority as the supreme court of the United States, and, as I think, concurred in by the courts of some of the states. I therefore, for the present, withhold my assent from it. I think the evidence failed to show that the bank made its loan to Mr. Martindale upon the security of its stock owned by him, and for that reason concur in the decision.