No. 20,804.

KATHERINE KELLY, *Appellee*, v. THE CENTRAL UNION FIRE INSURANCE COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. VERDICT—*Consistent Findings—Findings Conclusive.* Rule followed that a general verdict and consistent findings of fact dispose of all controverted issues of fact when based upon substantial though conflicting testimony.

2. INSURANCE CORPORATION — *Purchasing Its Own Capital Stock — Contract.* Record shows evidence sufficient to prove the contract in controversy, and to prove its authorization and ratification.

3. SAME—*Purchasing Its Own Stock—Reducing Overissue of Stock.* A statute forbidding a corporation to purchase or hold its own stock, either absolutely or as collateral, after it has once been issued, does not cover the transactions of a corporation during its formative stage, and before its corporate structure is perfected, in contracting for the surrender and cancellation of subscription stock to suppress an overissue in excess of its authorized capitalization, when such correction of the illegal overissue is done in good faith, free of any taint of fraud, and not in prejudice of the rights of third parties.

4. SAME—*Ultra Vires Contract—When Enforceable.* A corporation can not avoid its obligation on a plea of *ultra vires* when it has appropriated the consideration and received the benefits of it, and where the party seeking to enforce it has fully performed her share of the bargain.

5. INSURANCE CORPORATION—*Method of Extinguishing an Overissue of Capital Stock—Valid.* Where a corporation in its formative stage discovers that it has oversold its authorized maximum capital stock, the fact that all stock sold after the maximum had been reached should have been treated as void will not bar a recovery for the agreed value or reasonable price of valid stock surrendered by a prior lawful subscribing stockholder to relieve the company's embarrassment and

to extinguish the overissue, when this method of correcting the company's capitalization is undertaken in good faith, free of any taint of fraud, and the rights of others are not affected thereby.

Appeal from Miami district court; JABEZ O. RANKIN, judge. Opinion filed June 9, 1917. Affirmed.

*H. L. Burgess,* of Olathe, *Hugh C. Smith, Paul E. Bradley,* and *Leslie J. Lyons,* all of Kansas City, Mo., for the appellant.

*Frank M. Sheridan,* and *Bernard L. Sheridan,* both of Paola, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This appeal relates to matters which transpired during the formative period of the defendant's corporate existence and requires a review of certain transactions relating to plaintiff's purchase of subscription shares of defendant's stock; the surrender and cancellation of plaintiff's stock to extinguish an overissue of capital stock; the partial payment to plaintiff for her surrendered stock, and the question of the defendant's liability to plaintiff for the balance of the agreed price, or reasonable value, of plaintiff's stock thus surrendered by her.

Plaintiff's petition alleged that in July, 1911, she purchased from defendant 900 shares of its capital stock and paid for the same in money and property amounting to $11,250, and that she received a proper stock certificate therefor. That about December 31, 1911, defendant discovered that it had overissued its capital stock to the number of some fifteen hundred shares in excess of its authorized capitalization; that its authorized capital was $350,000, being thirty-five thousand shares at a par value of $10 per share; and that it was necessary that some of the stock thus issued be canceled so as to reduce the actual stock issue to its maximum legal limit. The petition continues:

"Such overissue of the stock having occurred through an inadvertence in having agents at various sections of the country taking subscriptions for, and selling the stock. . . . But when it became apparent to the defendant company, and its various officers, of the said overissue of stock, and that it was necessary to call in and cancel about fifteen hundred shares of the stock so issued, thereupon the defendant, because of the foregoing, and in its effort to retire or cancel stock . . . under an

Kelly v. Insurance Co.

oral agreement on or about December 31st, 1911, . . . in considera-- tion that this plaintiff would return the said certificate, and permit it to be canceled. by the defendant, . . . it was at that time agreed be- tween the defendant and the plaintiff, that it would pay to the plaintiff the sum of $15 per share, or a total consideration of $13,500 for the said certificate of stock . . . and the defendant in pursuance thereof, at or about that time received the same, and caused the same to be can- celed. . . .

"That the defendant paid to this plaintiff, on or about the ——— day of June, 1912, $6000, under the terms of the said oral agreement; and that it has at all times since wholly refused and neglected to pay this plaintiff the remaining part of the said $13,500, which it agreed to pay," etc. '

Defendant's answer denied, generally and specially, all of the plaintiff's material allegations, denied that there was an overissue of its capital stock at any time, denied that it was necessary to cancel any stock, denied that it purchased or can- celed plaintiff's stock, denied that it paid her $6000 thereon—

"But if said stock was purchased, as alleged, from the plaintiff herein, . . . said contract and agreement was entered into, if at all, in the state of Missouri. That it was to be performed within the state of Missouri. That the defendant is an insurance company, organized under the laws of the state of Missouri. . . .

"That section 7063 of the Revised Statutes of the state of Missouri for the year of 1909, among other things provides as follows:

" 'No insurance company shall, directly or indirectly, purchase or hold, either absolutely, or as collateral, its own stock after the same has been once issued.' . . .

"That said alleged contract for the purchase of said stock, if made at all (and defendant denies that any such agreement was made), was contrary to said statute of the state of Missouri, and was therefore *ultra vires*, void, and of no force or effect, and not binding upon the defendant company."

Answering further, the defendant alleged that from the spring of 1910 until August 8, 1911, the plaintiff's husband, T. T. Kelly, was secretary of the defendant company, and as such official he had charge of the promotion and organization of the company and the sale of its capital stock; that after August 8, 1911, he was the president and a director of the company, and was the principal officer and manager of the company and entrusted with its management and with control of its affairs; that on June 2, 1911, he caused a certificate for 1000 shares of the stock to be issued to himself; that on July 20, 1911, he caused that certificate to be canceled, and in lieu

thereof caused the issue of two certificates to be made, one for 100 shares in his own behalf and another for 900 shares to be issued to plaintiff; and that thereafter through the company's stock salesmen he effected a sale of 1000 shares to a Dr. J. M. Singleton for the sum of $15,000, being $15 per share.

"Said salesmen in selling said stock to Dr. J. M. Singleton supposed that they were selling treasury stock of said company, but that said Kelly upon his own initiative, and without the knowledge or consent of defendant company for the purpose of making a personal profit for himself caused the two certificates of stock then held by himself and his wife, . . . to be surrendered and transferred upon the books of the defendant company and a new certificate, . . . for one thousand (1000) shares to be issued to Dr. J. M. Singleton. . . ."

The gist of other matters pleaded in the answer was that the Singleton stock was an outright purchase of the stock of plaintiff and her husband and not a purchase of treasury stock; that Singleton paid for his stock by giving promissory notes for the purchase price; that plaintiff's husband, as president of the company, made a real-estate loan to Singleton, with defendant's funds, upon condition that one of the promissory notes for $7500 given by Singleton should be paid with the moneys thus loaned to him, and that pursuant thereto plaintiff's husband received the sum of $7500.

"That this defendant has never exercised dominion or ownership of said notes, or either of them, and has never made any claim to or over the said notes, and it does not now claim any right, title or interest thereto; that said notes have never been listed or scheduled among the assets or property of the defendant company, but at all times have been and now are in truth and in fact the property of the said T. T. Kelly."

Plaintiff's reply admitted that originally a certificate of stock in the name of her husband for 1000 shares had been prepared, but never with her consent; that two certificates should have been prepared in the first instance—one representing her interest of 900 shares, and one representing her husband's interest of 100 shares; that when the overissue was discovered, her husband, as president of the company, offered to return to her the money and property (mortgages) which she had paid for her stock and pay her the balance of the then reasonable and agreed price, or if the property could not be

returned the defendant would pay her $15 per share. Other features of the plaintiff's reply read:

"That thereupon she surrendered the said certificate of stock, first endorsing it, and delivered it to T. T. Kelly, for the defendant company at Paola, Kansas, on or about the latter part of December, 1911, or the fore part of January, 1912, and that thereafter, the defendant has kept and retained the said certificate and has not paid to this plaintiff any of the said purchase price, except the sum as stated in plaintiff's petition.

"Third.  This plaintiff admits that T. T. Kelly is and has been for many years the husband of the plaintiff and that he was the secretary of the defendant company as well as the president of the defendant company.  That he had all the power and authority in behalf of the defendant expressed in the petition of the plaintiff, and further alleges that each and all of his acts and proceedings with relation to the defendant and in reference to the stock of this plaintiff and the surrender thereof, were from time to time fully known and approved and ratified by the board of directors, stockholders and the executive committee of the defendant, including the various officers of the defendant, and that the defendant and its said board and officers and the committees acquiesced in, approved and consented and had previously authorized the procurement of the said certificate of stock by the said T. T. Kelly from this plaintiff. . . ."

On these issues, the cause was tried.  The jury returned a general verdict for plaintiff, and answered certain special questions propounded by plaintiff:

"2. . . .  State if the plaintiff at the instance and request of the defendant caused the said stock certificate to be delivered to the defendant with the intention and purpose on the part of the defendant and plaintiff, that the defendant would cancel the said stock certificate, and the rights of the plaintiff as the holder of such stock?  A.  Yes.

"3. . . .  State if the defendant did cancel the said certificate and thereafter exercised absolute control over the said stock?  A.  Yes.

"4. . . .  State if it is true that at the time the defendant so received the said certificate, that it did so with the belief on its part that there was an overissue of stock of the defendant, and that it was necessary to procure at least as much as 900 shares, in order to cancel the same to reduce the stock issue of the defendant to 35,000 shares?  A.  Yes.

"5. . . .  State if the defendant at that time agreed to pay the plaintiff for the said stock, and if so, the price of $13,500?  A.  Yes.

"6. . . .  What was the reasonable market value of the 900 shares of stock represented by the certificate of the plaintiff, at the time it was so delivered to the defendant?  A.  $15 per share or $13,500.

"7. How much did the plaintiff cause to be paid to the defendant for the 900 shares represented by her certificate, No. 488?  A.  $12.50 per share or $11,250.

"8. Was there at the time the defendant received the certificate of stock in question an overissue of stock of defendant? A. Yes."

Also certain questions of defendant:

"3. Did the plaintiff in this action receive the check for $7500.00 issued by the Central Union Fire Insurance Company to Henrie S. Dyson, given by Dr. J. M. Singleton in payment of one of his notes? A. Yes, she received the check.

"4. Was said $7500.00 received by plaintiff and applied by her in part-payment for her 900 shares of stock? A. $6000 was applied on her 900 shares of stock."

Defendant's principal contentions are: That the contract for the surrender and cancellation of plaintiff's stock was in violation of the laws of Missouri and prohibited by Missouri statutes, and that the laws of a corporation's domicile follow and govern its conduct into whatever jurisdictions the corporation may go; that the contract was also void under the laws of Kansas; that no contract was proven and no ratification shown; that if there was an overissue of defendant's stock the plaintiff's stock would not be affected thereby, but only the Singleton stock or whatever stock was issued after the authorized capitalization was sold in full, and that the holders of the excess issue of stock had their remedy against the corporation by demanding a return of the consideration paid for the excess issue, and that defendant's acquisition of plaintiff's stock did not change the situation or cure the defect in the capitalization; that the verdict was excessive in the principal sum of $1500 and interest computed thereon.

The general verdict and the special findings dispose of all controverted issues of fact. Although stoutly controverted by defendant, we find no difficulty in gleaning from the record ample evidence to prove the contract, its authorization and ratification. (*Getty v. Milling Co.,* 40 Kan. 281, 287, 19 Pac. 617; *Town Co. v. Morris,* 43 Kan. 282, 284, 23 Pac. 569.) There was, indeed, much evidence to the contrary. A skillful and persistent effort was made to prove that the cancellation of plaintiff's stock was merely to effect a sale and transfer of it to Dr. Singleton, and not at all to cure an overissue. But the jury has settled these matters. (*Bruington v. Wagoner,* 100 Kan. 439, syl. ¶ 1, 164 Pac. 1057, 1060.)

Kelly v. Insurance Co.

Statutes of Missouri, Missouri decisions, and Kansas decisions are cited and quoted to show that the contract for the surrender and cancellation of plaintiff's stock to correct and cure the overissue was *ultra vires* and expressly prohibited, and that the contract was against public policy. These have been carefully examined.  The Missouri statute forbids a corporation to purchase or hold its own stock, either absolutely or as collateral, after it has once been issued. (2 Rev. Stat. Missouri, 1909, § 7063; *Chrisman-Sawyer Banking Co. v. Independence Mfg. Co.,* 168 Mo. 634, 645, 647.) Such is the general rule.  Whether the purchase of its own stock by a corporation is positively forbidden by statute or by mere judicial disapproval of such a practice, there is no doubt that the rule is based on sound public policy.  (*Savings Bank v. Wulfekuhler,* 19 Kan. 60; *Abeles v. Cochran,* 22 Kan. 405; *Steele v. Telephone Association,* 95 Kan. 580, 148 Pac. 661.)

There is usually some leeway allowed by statute, or by judicial interpretation, for a corporation's temporary acquisition or control of its own outstanding capital stock for the purpose of protecting itself against loss.   (U. S. Rev. Stat., § 5201, 9 U. S. Comp. Stat. 1916, § 9762; Gen. Stat. [Kan.] 1915, § 2144; Rev. Stat. Mo., § 2990; *Battey v. Bank,* 62 Kan. 384, 63 Pac. 437; *Faulkner v. Bank,* 77 Kan. 385, 95 Pac. 153; *Bank v. Strachan,* 89 Kan. 577, 132 Pac. 200; *St. Louis Rawhide Co. v. Hill,* 72 Mo. App. 142, syl. ¶ 2.   See, also, notes in 61 L. R. A. 621, and 25 L. R. A., n. s., 50.)

But the transaction involved in the present case is unique. The corporation's purpose in procuring plaintiff's stock and canceling it was to correct a breach of its corporate powers which it had already committed, and it was not to reduce or hold within its own control its legitimate capital nor to commit a breach of any rule of public policy governing the manipulation of its own stock.  The corporation had illegally issued stock in excess of its authorized maximum capital. Some mode of correction had to be devised.  It was necessary that a report of its corporate financial status be made to the Missouri superintendent of insurance.  To apprise that officer of the excess issue of stock at that time might have brought down on the corporation the drastic consequences of usurping

illegal powers. The predicament of the corporation was not one which could be corrected by an amendment to its charter. The statute relating to that subject (Laws of Missouri, 1911, p. 276, Rev. Stat., § 7001a) regulates the reduction of a previously authorized and valid capitalization and for the amendment of the corporate charter in accordance therewith. That statute does not pretend to govern 'the suppression or extinguishment of an illegal overissue of stock. It can not be denied that the defendant corporation had power to correct the infirmity in its capitalization. It was its duty to do so. When the state creates a corporation, it not only confers authority upon it but it imposes a duty upon it—the duty to exercise its corporate functions and to exercise them in conformity to its grant of powers. This corporation had erred, and it was bound to correct that error in some appropriate way. The mode of relieving itself from its predicament was simple and not seriously inappropriate. It certainly was a harmless mode of correcting the irregularity. It did not prejudice the rights of creditors. It was not done to escape a stockholder's liability. It had no taint of fraud. Defendant's bargain with plaintiff for the surrender and cancellation of her stock to cure the illegal overissue was not such a purchase of plaintiff's stock as is contemplated by the inhibitions of the Missouri statute, and the bargain by which defendant was relieved of its embarrassment did not offend against any rational rule of public policy. It does not appear that the creator of this corporation, the state of Missouri, has challenged the corporate acts of defendant in effecting the readjustment and correction of its stock issue. The defendant was vitally benefited by the arrangement—not necessarily in money but in a more important way—by the restoration of its corporate integrity. The court is of opinion that the transaction involved here was not within the fair intendment of the statute cited, and did not offend against it either in letter or in spirit.

There are, indeed, two schools of jurists and two lines of authority on legal questions relating to *ultra vires* transactions. The case of *Harris v. Gas Co.*, 76 Kan. 750, 92 Pac. 1123, discusses at length both the strict and the liberal view concerning the consequences of *ultra vires* transactions. A long line of well-considered decisions has committed this court to the liberal

view that a corporation may not avoid its obligation on a plea of *ultra vires* when it has appropriated the consideration or received the benefits of it, and when the party seeking to enforce the obligation has fully performed his share of the undertaking. (*Cooper v. National Bank*, 40 Kan. 5, 18 Pac. 937; *Town Co. v. Morris*, 43 Kan. 282, 23 Pac. 569; *Town Co. v. Russell*, 46 Kan. 382, 26 Pac. 715; *Town Co. v. Lincoln*, 56 Kan. 145, 42 Pac. 706; *Railroad Co. v. Johnson*, 58 Kan. 175, 48 Pac. 847; *Opera House Co. v. Loan Association,* ante, p. 76, 53 Pac. 761; *Harris v. Gas. Co.*, 76 Kan. 750, 92 Pac. 1123; *Saylors v. Bank*, 99 Kan. 515, 519, 520, 163 Pac. 454, and cases cited; *Bank v. Wilson*, ante, p. 72; *Maine v. Casserly*, 67 Cal. 127, 7 Pac. 426; 10 Cyc. 1056-1067; 7 R. C. L. 677-681.)

It is suggested that the plaintiff's stock, being subscribed and paid for and issued before the excess issue occurred, was not affected by the overissue; and that the stock sold and issued after the authorized capitalization was completed was void. That is true. The plaintiff might have stood on her rights and held her valid stock, and let the defendant settle with Singleton, the last subscriber or one of the last, on the best terms possible. Singleton was very much desired as a stockholder and as a director, and the promoters of the corporation believed it to be very much to the corporation's advantage to have him interested in its success. In the formative stages of a corporation's development, considerable *bona fide* discretion must be allowed to its promoters to effect its success, and the wise apportionment of its stock and unselfish concessions of stock distribution by promoters to invoke and attach the interest of other influential and responsible parties, free of any taint of fraud or prejudice of third parties, are worthy of commendation rather than condemnation. Be that as it may, it would never do to deny redress to plaintiff who parted with her stock to favor and benefit the defendant and to relieve it from its dilemma, merely because as lawyers and judges we happen to know that there was another and more strictly regular mode by which the corporation might have dealt with its overissue.

It needs but a word to dispose of the question relating to the excessive verdict. The plaintiff and her husband surrendered their stock as a part of the arrangement to extinguish the

overissue. She received $7500, of which $6000 was a payment on her own stock, and $1500 was to pay for her husband's stock. That matter was perfectly clear to the trial court and jury, and it is clear to us. The defendant owed her for the balance of the agreed price—or the balance of the reasonable worth of the surrendered stock, which in this case amounted to the same thing—and the verdict for that amount and interest is not excessive. The judgment is affirmed.