Mitchell v. Beachy.

No. 22,001.

W. R. MITCHELL and C. A. GARBER, *Appellees*, V. RICHARD BEACHY, THE STATE BANK OF ESBON *et al.*, *Appellants*.

### SYLLABUS BY THE COURT.

1. CONTRACT—*Stockholders of Bank—Agreement Relating to Purchase of Outstanding Shares of Stock.* A contract entered into by the holders of all the stock of a bank except three shares, terming themselves "parties of the first part" and "party of the second part," that should the three shares or any of them be purchased by the bank "or any part of them" each party to the instrument should be entitled to one-half thereof, and that when all three shares should be purchased by the bank "each party to this contract" should own one-half of the stock thereof, was binding on the shareholders who executed the contract, and after each faction had bought one of such shares the purchase by one faction of the third share still left the other faction owner and entitled to control of one-half thereof.

2. BANK STOCK—*Transfer—Method of Assignment.* An officer of the bank owning five shares executed a written assignment for one-half of one share to the cashier, who was the second party to the contract referred to in, paragraph 1 hereof. Such assignment expressly authorized the proper officers of the bank to make the necessary transfer on the stock-certificate book, and the assignor promised to deliver the certificate for the five shares within a day or two, but failed so to do. *Held*, that the cashier in issuing to himself a certificate for the one-half share and in marking the old certificate canceled when finally delivered acted within the authority expressed in the assignment.

3. SAME—*Assistant Cashier Had No Authority to Issue Certificates of Bank Stock.* When the assignment and transfer were executed, and made, the stock books showed the assignor to be the holder of five shares, and the only method provided in the by-laws for the issuance of stock was by the act of the president and cashier. After the transfer was made, another officer of the bank and the assistant cashier executed to the former a certificate for the five shares. *Held*, that the assistant cashier had no authority to issue certificates, and that for this reason and because of the attempted issuance of one-half of one share more than there was outstanding, such certificate was void as to such one-half share, and the cashier cannot be compelled to treat such issue as valid.

4. SAME—*Corporate Stock is Nonnegotiable.* Corporate stock is not negotiable, and whoever takes it does so subject to the equities and burdens thereof.

5. SAME—*Duty of Bank Cashier to Notify Bank Commissioner of Transfer of Bank Stock.* It is the duty of the cashier of a bank upon the

transfer of any of its stock to certify immediately to the bank commissioner such change of ownership.

6. SAME—*Passing of Title to Bank Stock.* Neither the fact that the assignment of the one-half share was not written upon the back of the certificate nor the failure of the assignor to surrender up the old certificate for cancellation precluded the passing of title to such half share.

7. SAME. One having no title to corporate stock cannot by a pretended or attempted sale thereof pass title thereto.

8. SAME—*Action to Compel Transfer.* Whether the action be regarded as strictly one in mandamus or as one of equitable consideration, the plaintiffs are not entitled to prevail.

Appeal from Jewell district court; RICHARD M. PICKLER, judge. Opinion filed March 8, 1919. Reversed.

*J. R. White,* of Mankato, *F. W. Mahin,* and *I. M. Mahin,* both of Smith Center, for the appellants.

*R. W. Turner, Donald F. Stanley,* both of Mankato, and *W. D. Vance,* of Belleville, for the appellees.

The opinion of the court was delivered by

WEST, J.: The plaintiffs sued to compel the defendants to issue to them certain certificates of stock in the State Bank of Esbon and to cancel outstanding certificates then held by Richard Beachy. The issues were so framed as to include a much wider controversy than indicated by what is called the application for the writ, and the trial resulted in a judgment for the plaintiffs, from which the defendants appeal.

H. B. Keim, R. S. Beachy and M. J. Beachy were in the banking business at Esbon and owned all the capital stock of the State Bank except three shares, one of which was owned by W. E. Mallory, one by A. S. Poulson and one by J. C. Hershner, represented respectively by certificates No. 1, No. 2 and No. 3, each for $100, there being 153 shares in all.

Early in 1903 a contract was entered into by which H. B. Keim, R. S. Beachy and M. J. Beachy sold to Richard Beachy an interest in the bank, and in which it was agreed that the total capital should be $30,300, divided into shares of $100 each, of which $15,300 should be shown as capital stock and the remainder placed to the credit of Beachy, Keim & Co., and used by the bank as though it were capital stock. The $15,300

capital stock was to be divided one share each to R. S. Beachy, Hershner, Mallory, and Poulson, 59 shares to H. B. Keim, 15 to M. J. Beachy and 75 to Richard Beachy. It was also agreed that should the three shares of stock not owned by the parties be purchased by the Bank of Esbon "or by any part of them," then each party to the contract should be entitled to one-half of such stock as might be purchased from time to time, and when all such outstanding stock should be purchased by the bank each party to the contract should own one-half of the stock thereof. It was also agreed that neither party to the contract should join the stock not owned by either of them when it should come to a matter of voting on any issue that might arise in the bank, but that all matters should be decided wholly by both parties to the contract and by them only. The contract was signed by H. B. Keim, M. J. Beachy and R. S. Beachy, "Parties of the First Part," and Richard Beachy, "Party of the Second Part." In 1906 the stock was increased to $25,000, each faction holding 123½ shares.

The plaintiffs alleged that the defendant Richard Beachy was cashier; that they had bought 125½ shares of the bank stock; that the original shares were delivered to them properly signed and registered by the owners thereof; that after they delivered their certificates to the defendant Richard Beachy he caused to be executed and delivered to them 119½ shares and refused to deliver the other 6 shares, for the purpose of keeping in himself and immediate members of his family the control of the bank; and that the 6 shares were represented by certificates No. 31 and No. 34.

The answer alleged that on the 14th day of October, 1916, when certificate No. 34 purported to have been issued, the full 250 shares were outstanding and No. 34 was void as an overissue and because of not being properly executed. The same allegation was made regarding certificate No. 31. It was denied that Richard Beachy had ever refused to issue new certificates to the holder of any valid certificate; that when the contract was entered into certificates No. 1, No. 2, and No. 3 stood in the names of Mallory, Poulson, and Hershner.

The provision of the contract already referred to was pleaded, and it was further alleged that on or about December 3, 1908, H. B. Keim bought the Mallory share, to the certificate

of which there was attached a written assignment by Mallory
to H. B. Keim, who, for the purpose of covering and concealing·
the fact of his purchase, inserted before his name in the assign-
ment the letters "Mrs.," but that no assignment was ever made
to Mrs. Keim; that on or about January 7, 1914, H. B. Keim
fraudulently attempted to assign this certificate to one Albert
Jelinek, writing on the back thereof an assignment, and sign-
ing it "H. B. Keim"; that at this time Jelinek was an em-
ployee of the bank and had knowledge that Richard Beachy
was the owner of one-half of this share of stock, and that the
pretended assignment from H. B. Keim to Albert Jelinek was
never entered on the books or records of the bank; that at
the time of executing this assignment Jelinek promised to
deliver on the following day certificate No. 30, but that it was
not delivered until October 14, 1916, when it was marked
canceled; that on or about October 14, 1916, H. B. Keim, who
was then president, wrongfully and in the nighttime, and not
in the presence of Richard Beachy, the managing officer in
control of the bank and in possession of the books and records,
entered the bank and issued to himself a pretended certificate
for five shares, numbering it 34; that on or about January
14, 1914, H. B. Keim fraudulently attempted to issue to L. G.
Keim, his wife, certificate No. 31 for one-half a share, when
the full amount of authorized stock was already outstanding;
and that these fraudulent certificates were the ones on which
the plaintiffs based their claims, although when purchasing
them "the plaintiffs had full knowledge of all matters and
things herein alleged." Then followed numerous averments
of misconduct on the part of the Keim faction, and of H. B.
Keim himself, which need not be set forth.

The record shows that Keim bought the Mallory share Janu-
ary 3, 1908, but let it stand in the name of Mallory until Janu-
ary 17, 1914, the dividends being paid to Mallory during all that
time. The assignment by Mallory was made to read "Mrs."
H. B. Keim. Six years thereafter H. B. Keim assigned the cer-
tificate to Albert Jelinek. After Richard Beachy learned that
the Mallory share had been purchased, he bought the Poulson
share for his son. This left the two crowds equal, with the
Hershner share to be bought and divided to keep them equal,

or to be acquired by one and thereby gain the controlling interest in the bank.

About August 6, 1913, Jelinek bought the Hershner share for $525. He testified that when Richard Beachy wanted him to divide this share with him and said that half of it belonged to him according to the contract, he, Jelinek, refused, saying that before he did anything about it he wanted Mr. Keim to know about it, and having seen Keim he told Beachy that Keim said that whenever he was ready to dispose of his interest in the bank he, Keim, would give Jelinek the first chance on it. Also that later, when requested to come back into the bank, Jelinek replied that he would do so for the sake of the bank and Mr. Keim's interests; and that after this he transferred the certificate to Mrs. Keim, Mr. Keim bringing the money.

On April 11, 1914, Albert Jelinek owned 5 shares, certificate No. 30, which stood in his name on the books of the bank. He executed a written assignment for one-half of one of these shares to Richard Beachy and agreed to bring in certificate No. 30 for cancellation and reissue, but it was not delivered until months afterwards.

The written assignment executed by Jelinek expressly authorized the proper officers of the bank to make the necessary transfer on the stock-certificate book. The method adopted by the bank and set forth in its by-laws was to surrender up for cancellation assigned stock, and issue new certificates in lieu thereof, so that when the cashier issued to himself a new certificate for one-half a share he was acting under this authority, as he was in marking the old certificate canceled when it was finally turned in. The statute requires transfers to be made in accordance with the by-laws. (Gen. Stat. 1915, § 570.) Jelinek testified that when he executed the assignment he knew that certificate No. 30 stood in his name on the books of the bank, and that he first decided not to bring it in after he saw his wife, who said she would turn it over to Keim, and that she never paid him anything when he turned it over to her. The old certificate offered in evidence showed an assignment by him to his wife in February preceding the April when he made the assignment of a one-half share to Beachy. When Beachy issued certificate No. 32 to himself for the one-half share he

placed to Jelinek's credit $270. Jelinek testified that after scratching out this entry "in order to keep the ledger in balance" he made another account and gave credit to Albert C. Jelinek, but did not draw it out. It was still to his credit at the time of the trial. The dividends on the Hershner share were divided between the two parties after 1914. It is said in the defendants' brief that "Mrs." is in different ink and of a later date than the assignment by Mallory. At any rate, the certificate was not assigned by her, the apparent owner, but by her husband who on the face of the previous assignment had no interest in the certificate. Similarly, what appeared to be Mrs. Jelinek's stock was assigned by Mr. Jelinek.

Corporate stock is not negotiable, and whoever takes it does so subject to the equities and burdens, even though ignorant thereof. (*Hammond & Co. v. Hastings,* 134 U. S. 401; Clark on Corporations, 3d ed., 330, 540.) The contract made between the two factions of the bank by which each was to obtain one-half of the stock and neither was to have the controlling interest is clear, and its intention is not a matter of doubt. That the Keim faction undertook to violate this agreement is plain. The attempted issue of the certificates involved herein was in violation of the contract, and, as between the two factions, wrongful and unjustifiable on the part of the Keim crowd. It is also clear that Jelinek was used by the Keims to manipulate purchases and transfers for their benefit.

Richard Beachy had all this time been cashier of the bank, in charge of all the books and records, and he is not responsible for the overissue or for the violation of the contract by the Keims or for the purchase of the shares in controversy.

When the stock of a bank is paid in, the cashier must transmit to the bank commissioner the names and residence of the stockholders and the amount held by each. (Gen. Stat. 1915, § 518.) It was said in *Faulkner v. Bank,* 77 Kan. 385, 94 Pac. 153:

"A bank must at all times have a register of its stockholders. It must know who is entitled to vote its stock, who is entitled to receive dividends, who may be called upon for assessments, and, generally, who should bear the burdens and receive the benefits of stock ownership. . . . True, shares of stock are personal property, and as such are transferable; but upon a change of ownership the transfer must be made on the books of the bank, and must be certified immediately to the bank commissioner." (p. 387.)

(See, also, *Bank v. Price,* 79 Kan. 283, 292, 98 Pac. 222, 100 Pac. 280.)

In *Bank v. Strachan,* 89 Kan. 577, 132 Pac. 200, it was held that a transfer is essential to a release from liability of a shareholder.

A few peculiar things about the case disclosed by the evidence are that Jelinek claims that he was intimidated by Beachy into assigning the one-half share of stock (which was denied *in toto* by Beachy) and afterwards he came back into the bank at Beachy's request. Another is that Jelinek testified that he had destroyed all the correspondence with Keim about the Hershner share of stock; and Mr. Keim, said to be present in the court room, did not take the stand, but left whatever explanation was made of his and his wife's connection with this share to be testified to by her. Jelinek testified that he first talked about transferring the half share to Beachy the latter part of August or the first part of September, 1913.

"I told Mr. Beachy I would divide the one share of stock, but on advice of Mr. Keim I refused to do so. I wrote Mr. Beachy to the effect that I intended to divide the stock until I saw Mr. Keim and he objected to me dividing the stock."

The plaintiffs assert in their brief that the certificates issued for one-half share to Beachy and for 4½ shares to Jelinek were void because original certificate No. 30 was not surrendered to the bank at the time and because the by-laws required this to be done as a prerequisite to the transfer and issuance of new stock. It is true that section 20 of the by-laws provided that the stock was transferable only on the books of the bank and that when the stock was transferred the certificates should be returned and canceled and new certificates issued, but it is also true that the same section provided that the certificates of stock "signed by the president and cashier" (not the assistant cashier) "may be issued to shareholders," and that both of the certificates, No. 31 and No. 34, were signed by the president and Jelinek, assistant cashier, and not by the cashier. This defect must have been recognized and the attention of the court called thereto, because the order not only granted the mandamus but directed the cashier to "correct any defect in form as to the issuance of certificate numbers thirty-one (31) and thirty-four (34); by attaching his signa-

ture as cashier to said certificates and to transfer the shares of stock represented by said certificates upon the books."

The fact that the assignment from Jelinek to Beachy was not written on the back of the certificate did not preclude the passing of title. (Thompson on Corporations, 2d ed., § 4321, and cases cited.) "As between the corporation and the stockholder the stock book is primary and the certificate secondary evidence of their relation. And in case of dispute the transfer book controls." (§ 4331.) It has been held that a statute making void a transfer not entered was satisfied by an entry on the books of a memorandum of an assignment showing the sale, though not on the certificates, and though the certificates themselves were not transferred. (§ 4333. *Equitable Securities Co. v. Johnson,* 36 Colo. 377, 85 Pac. 840.) A by-law providing that the stock should be transferred only on the books of the corporation was held not to prevent acquisition of title to stock by assignment from the owner without transfer on the books. (§ 4337; *Crenshaw v. Mining Co.,* 110 Mo. App. 355.) In the case last cited it was said that neither statute nor by-laws were intended to prevent the alienation of corporation stock thereby, but to enable corporations to deal with intelligence with their stockholders. (p. 365. See, also, 7 R. C. L. 264, § 242.) According to Jelinek's own testimony he owned the one-half share when he issued it to Beachy, because he does not claim that he gave it to his wife, and he received nothing from her for it. Being the owner and having by written assignment conveyed it to Beachy with express authority to make the necessary transfer on the books, he cannot by his own failure to return the certificate, as he agreed to do, avoid Beachy's act in making the transfer.

As to overissue, see *Kelly v. Insurance Co.,* 101 Kan. 91, 165 Pac. 806, and Thompson on Corporations, 2d ed., § 3545. No one holding a share of stock void for overissue can compel the real owner so to manipulate the stock books as to deprive him of his share, and by so much the more he cannot by mandamus compel the cashier of the corporation to recognize as valid a certificate void for overissue.

One having no title to stock cannot by a pretended or attempted sale thereof pass title thereto. Even if the plaintiffs purchased without knowledge or notice of the real condition

Rickel v. Railway Co.

of things they can claim no better title than their vendors had, and can demand no unlawful or *ultra vires* act of the defendants.

Certainly, viewed as a controversy of an equitable nature, as the case is said to have been treated by the trial court, the equities are not with plaintiffs. (*Moore v. Crawford*, 130 U. S. 122, 132.)

Whatever the proper claims of the plaintiffs may be against the Keim faction or those from whom they bought certificates No. 31 and No. 34, they are not entitled to the relief sought and obtained against the defendants in this action.

The judgment is reversed, and this cause is remanded with directions to deny the writ.